UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NANCY DRAYTON,

       Plaintiff,                                Hon. Richard Alan Enslen

v.                                          Case No. 1:04-CV-286

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION**

       This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

       The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that **this matter be remanded for further factual findings pursuant to sentence six of 42 U.S.C. § 405(g)**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 41 years of age at the time of the ALJ's decision. (Tr. 19). She successfully completed high school and worked previously in service and factory positions. (Tr. 19, 77, 82, 103-08).

Plaintiff applied for benefits on November 6, 2001, alleging that she had been disabled since September 25, 2000, due to a broken tailbone and seizures. (Tr. 59-61, 76, 321-23). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 33-58, 325-29). On April 25, 2003, Plaintiff appeared before ALJ Daniel Dadabo, with testimony being offered by Plaintiff and vocational expert, Timothy Bobrowski. (Tr. 339-80). In a written decision dated July 23, 2003, the ALJ determined that Plaintiff was not disabled. (Tr. 18-29). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 6-10). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## MEDICAL HISTORY

On October 9, 2000, Plaintiff was examined by Dr. Jayne Martin, at the Michigan State University Department of Neurology and Ophthalmology. (Tr. 133-35). Plaintiff reported that she had been experiencing "dizziness" and episodes of "feeling outside her body" for approximately

eight weeks. (Tr. 133). The results of a neurological examination were "within normal limits." (Tr. 134). The doctor observed that Plaintiff's "spells seem to be most consistent with complex partial seizure."[1] *Id.* Several months prior to this examination, Plaintiff participated in an MRI examination of her brain, the results of which were "normal." (Tr. 132).

On December 26, 2000, Plaintiff was examined by Dr. James Stubbart. (Tr. 243-44). Plaintiff reported that she fell down a flight of stairs several months previously, fracturing her tailbone. (Tr. 243). Plaintiff reported that other than using a donut pillow she had not received any treatment for her tailbone injury. *Id.* X-rays of Plaintiff's sacral spine revealed an anteriorly flexed distal sacrum, a portion of which "appears free-floating." (Tr. 244). X-rays of Plaintiff's lumbar spine revealed "considerable" disc space collapse at L5-S1. The doctor diagnosed Plaintiff with coccydynia[2] and degenerative disc disease at L5-S1. *Id.*

On February 7, 2001, Plaintiff was examined by Dr. John Serini. (Tr. 148-49). Plaintiff reported that she was experiencing diarrhea. (Tr. 148). The results of a physical examination were unremarkable. (Tr. 147, 149). Plaintiff participated a CT scan of her pelvis and abdomen, the results of which were "normal." (Tr. 148). The doctor diagnosed Plaintiff with chronic diarrhea and scheduled her to participate in a series of follow-up examinations. (Tr. 149).

---

[1] Complex partial seizures usually begin in a small area of the temporal lobe or frontal lobe of the brain. *See* Complex Partial Seizures, *available at*, http://www.epilepsy.com/epilepsy/seizure_complexpartial.html (last visited on August 8, 2005). These seizures quickly involve other areas of the brain that affect alertness and awareness. Even though the individual's eyes may be open and they may make movements that seem to have a purpose, in reality "nobody's home." If the symptoms are subtle, other people may think the person is just daydreaming. Also, because such seizures can wipe out memories of events occurring just before or after the seizure, memory lapses can be a problem. *Id.* Complex partial seizures often last 30 seconds to 2 minutes, but longer seizures may occur, particularly when the seizures become generalized. *See* Complex Partial Seizures, *available at*, http://www.emedicine.com/NEURO/topic74.htm (last visited on August 8, 2005).

[2] Coccydynia refers to pain in the coccyx (the lowest part of the spine) and in the surrounding region. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* C-265 (Matthew Bender) (1996).

On February 13, 2001, Plaintiff participated in a fluoroscopy examination of her upper GI and small bowel, the results of which were "normal." (Tr. 150). On March 20, 2001, Plaintiff participated in a colonoscopy, the results of which were "normal." (Tr. 147). A biopsy of Plaintiff's colon was also "normal." *Id.*

On July 12, 2001, Plaintiff was examined by Dr. Randal Palmitier. (Tr. 164-65). Plaintiff reported that she was experiencing pain over her sacrum which she rated as 8/10. (Tr. 164). Plaintiff reported that her symptoms were exacerbated by standing and walking and relieved by sitting. The doctor observed tenderness over Plaintiff's sacral coccygeal junction. Plaintiff exhibited "normal" alignment and was able to "flex and extend through full range of motion." Straight leg raising was negative and she exhibited pain-free range of hip motion. The doctor observed no evidence of sensory or motor deficit. X-rays of Plaintiff's sacrum revealed a "fairly acute angle at the sacral coccygeal junction," but no evidence of fracture. *Id.* Dr. Palmitier diagnosed Plaintiff with coccydynia. (Tr. 165).

On July 31, 2001, Plaintiff reported to the emergency room, complaining of chest pain. (Tr. 169). The results of a physical examination were unremarkable and Plaintiff was in no acute distress. (Tr. 169-72). X-rays of Plaintiff's chest were negative. (Tr. 172). Plaintiff participated in an EKG examination, the results of which were "normal." (Tr. 168). Plaintiff was admitted to the hospital for observation, but discharged the following day after doctors concluded that her pain was not cardiac in nature. (Tr. 167-68). On August 6, 2001, Plaintiff participated in a stress echo examination, the results of which were normal with no evidence of ischemia, arrhythmia, or wall motion abnormality. (Tr. 189-90).

On October 2, 2001, Plaintiff participated in an electroencephalogram examination, the results of which were "normal." (Tr. 226).

On November 5, 2001, Plaintiff was examined by Dr. Palmitier. (Tr. 191). Plaintiff reported that her lower back pain had improved fifty-percent. She rated her pain as 3 on a scale of 1-10. An examination revealed no evidence of root tension or neurologic deficit. Plaintiff was diagnosed with coccydynia and discogenic pain. *Id.*

On November 19, 2001, Plaintiff was again examined by Dr. Martin. (Tr. 245-46). Plaintiff reported that she had experienced "only one seizure since her last visit." (Tr. 245). Plaintiff reported that her medication "has been beneficial to her." The doctor reported that Plaintiff likely suffered from complex partial seizure disorder. *Id.* Plaintiff was instructed to continue her medication. (Tr. 246).

Plaintiff returned to Dr. Palmitier on November 26, 2001, complaining of "excruciating" pain in her lower back. (Tr. 211). An examination revealed no evidence of weakness, sensory deficit, or positive root tension. The doctor concluded that Plaintiff was experiencing "mechanical symptoms" with a discogenic source and a coccydynia component. *Id.*

On November 29, 2001, Plaintiff participated in a CT scan of her abdomen, the results of which were "normal." (Tr. 225).

On March 7, 2002, Dr. Martin reported that Plaintiff's "seizure disorder has no impact on her ability to sit, stand, walk, lift, carry, hear or speak." (Tr. 257). The doctor further reported that "from a neurologic standpoint [Plaintiff's] seizures are relatively well controlled on monotherapy, thus not impairing her ability to maintain employment." *Id.*

On April 18, 2002, Plaintiff participated in a consultive examination performed by Wayne Kinzie, Ph.D. (Tr. 258-63). Plaintiff reported that she experiences "a lot of pain problems." (Tr. 258). Plaintiff also reported experiencing anxiety and depression. She reported that she was taking medication for her emotional problems and that "it's okay now." Plaintiff reported that she was participating in counseling for depression and marital difficulties. *Id.* Plaintiff appeared to be depressed, but the results of a mental status examination were otherwise unremarkable. (Tr. 260-61). Dr. Kinzie diagnosed Plaintiff with (1) major depressive disorder (mild) and (2) adjustment disorder with depressed mood (current marital difficulties). (Tr. 262). Plaintiff's current GAF score was rated as 51 and her highest GAF score within the last year was rated as 55.[3] *Id.*

On May 6, 2002, Dr. Charles Overbey completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 265-78). Determining that Plaintiff suffered from a disturbance of mood, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 266-74). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular impairment. (Tr. 275). Specifically, the doctor concluded that Plaintiff suffered moderate restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced episodes of deterioration or decompensation in work or work-like settings. *Id.*

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 51-55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

Dr. Overbey also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 279-80). Plaintiff's abilities were characterized as "moderately limited" in three categories. With respect to the remaining 17 categories, however, the doctor reported that Plaintiff was either "not significantly limited" or that there existed "no evidence of limitation." *Id.*

On May 15, 2002, Irwin Greenbaum, Ph.D. reported that he had been treating Plaintiff for depression since January 12, 2002. (Tr. 286). The doctor reported that Plaintiff was suffering from major depression, single episode, mild. Dr. Greenbaum reported that Plaintiff "has made progress in treatment" and "has shown some improved coping skills." *Id.*

On July 8, 2002, Plaintiff was examined by neurologist, Dr. Desiderio Ines. (Tr. 307-08). The examination revealed no evidence of neurological, motor, or sensory abnormality. (Tr. 308). The doctor concluded that Plaintiff suffered from "complex partial seizure or simple partial seizure now mainly manifested as aura lasting a few seconds to even minutes." He modified Plaintiff's medication and instructed her to return in three or four months. *Id.*

On October 14, 2002, Dr. Ines reported that Plaintiff was "doing real well." (Tr. 310). Plaintiff participated in an electroencephalogram examination on October 29, 2002, the results of which were "normal." (Tr. 315).

On April 25, 2003, Plaintiff testified at the administrative hearing. Plaintiff reported that she continued to experience two or three seizures weekly. (Tr. 348-49). Plaintiff testified that she experiences lower back pain which regularly rates as 8 on a scale of 1-10. (Tr. 351). Plaintiff testified that she experiences diarrhea 9-10 times daily and experiences incontinence "usually once

8

a day." (Tr. 352). As for activities, Plaintiff testified that she is incapable of doing anything and is confined to her recliner. (Tr. 356-57).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

### B. The ALJ's Decision

The ALJ found that Plaintiff suffers from the following severe impairments: complex partial seizures, obesity, depression, coccydynia, L5-S1 disc herniation, and irritable bowel

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

9

syndrome. (Tr. 20). The ALJ determined that these impairments, neither alone nor in combination, satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 28). The ALJ further determined that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 29). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work "subject to only moderate restrictions of social and occupational functioning requiring the need to minimize interaction with co-workers and

supervisors and a flexible pace." (Tr. 27). After reviewing the relevant medical evidence, the undersigned concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could no longer perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Timothy Bobrowski.

The vocational expert testified that there existed approximately 4,700 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 373-77). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

      a.   The ALJ Properly Assessed Dr. Greenbaum's Opinion

On April 23, 2003, Dr. Greenbaum provided a sworn statement in support of Plaintiff's application for benefits. (Tr. 287-304). Dr. Greenbaum reported that Plaintiff continued to experience "significant depression, moodiness, [and] difficulties with concentration." (Tr. 291). The doctor reported Plaintiff's then-present GAF score as 42 and her highest GAF score within the past year as 45.[5] (Tr. 296). The doctor also stated that Plaintiff experienced sleep disturbances, marital conflict, difficulty focusing, difficulty making decisions, fatigue, and weakness. (Tr. 291-92). Dr. Greenbaum reported that Plaintiff continued to experience "episodic seizures" which cause her to experience "difficulties focusing [and] concentrating." (Tr. 292-93). The doctor further stated that Plaintiff's seizure disorder "has had a big impact" on her. (Tr. 293). Dr. Greenbaum testified that Plaintiff is "very severely limited" and was incapable of performing work-related activities on a full-time basis due to her various impairments. (Tr. 296-97). Plaintiff asserts that because Dr. Greenbaum was her treating physician, the ALJ was obligated to accord controlling weight to his opinion.

      The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

---

[5] A GAF score of 42 or 45 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 32.

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ is not bound by conclusory statements, particularly when unsupported by detailed objective criteria and documentation. *See Cohen*, 964 F.2d at 528.  Finally, the ALJ need not defer to an opinion contradicted by substantial medical evidence. *See Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

Dr. Greenbaum testified that between January 12, 2002, and April 23, 2003, he had met with Plaintiff 30 times.  (Tr. 291, 295).  The record before the ALJ, however, contains none of the doctor's treatment notes regarding these visits.  Aside from the doctor's sworn statement, the only evidence in the record regarding Dr. Greenbaum's treatment of Plaintiff is the May 15, 2002 letter identified above, in which the doctor reported that Plaintiff, although suffering from depression, had exhibited "improved coping skills" and had "made progress in treatment."

As the ALJ correctly concluded, Dr. Greenbaum's testimony "contains few basic mental status findings" and does not appear to be supported by the results of any objective testing. (Tr. 25).  As discussed below, Dr. Greenbaum later supplemented (after the ALJ rendered his decision) the record with medical evidence addressing these apparent deficiencies.  While the Court finds that there exists a reasonable probability that consideration of this supplementary material would have led to a different result, the ALJ's decision to accord less than controlling weight to Dr. Greenbaum's testimony, in light of the evidence then available, was appropriate.

      b. There exists no Evidence that the ALJ was biased against Plaintiff

Plaintiff claims that subsequent to the decision in this matter the ALJ recused himself from all cases involving Plaintiff counsel's "office." Plaintiff asserts that this action demonstrates that the ALJ was unfairly biased against her. Plaintiff also accuses the ALJ of having written his decision before the administrative hearing "with the supporting analysis massaged to fit the pre-ordained conclusion." Plaintiff's allegations are baseless and lack any evidentiary support.

Plaintiff has submitted no evidence supporting the allegation that the ALJ recused himself from all matters involving her counsel's "office." Moreover, even assuming that this assertion is accurate, Plaintiff has submitted absolutely no evidence regarding the reasons why the ALJ took such action. Counsel acknowledges that he does not know why the ALJ recused himself from cases involving his office, but nonetheless simply assumes (in the absence of any evidence) that the ALJ did so because "he was prejudiced against us." Plaintiff's assertion is nothing more than speculation. To merit relief, Plaintiff must present more than unfounded speculation.

      c. Plaintiff is entitled to a remand in this matter

As part of her request to obtain review of the ALJ's decision, Plaintiff submitted to the Appeals Council additional evidence which was not presented to the ALJ. (Tr. 330-34). The Appeals Council received the evidence into the record and considered it before declining to review the ALJ's determination. (Tr. 6-10). This Court, however, is precluded from considering such material. In *Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996), the Sixth Circuit indicated that where the Appeals Council considers new evidence that was not before the ALJ, but nonetheless declines to review the ALJ's determination, the district court cannot consider

such evidence when adjudicating the claimant's appeal of the ALJ's determination. *Id.* at 148; *see also*, *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993).

If Plaintiff can demonstrate, however, that this evidence is new and material, and that good cause existed for not presenting it in the prior proceeding, the Court can remand the case for further proceedings during which this new evidence can be considered. *Id.* To satisfy the materiality requirement, Plaintiff must show that there exists a reasonable probability that the Commissioner would have reached a different result if presented with the new evidence. *Sizemore v. Secretary of Health and Human Serv's*, 865 F.2d 709, 711 (6th Cir. 1988).

This additional material consists of the results of a psychological evaluation which Dr. Greenbaum conducted with Plaintiff on September 5, 2003. (Tr. 330-34). The doctor reported that Plaintiff exhibited "residual symptoms" from a recent seizure and was "preoccupied and distracted and had a difficult time focusing." (Tr. 332). Plaintiff exhibited a "sluggish and labored" stream of mental activity and acknowledged experiencing "frequent suicidal ideation." *Id.*

Dr. Greenbaum administered to Plaintiff "a battery of standardized psychological testing," the results of which revealed that she was "a significantly depressed, highly anxious individual, prone to withdrawal and marked social anxiety." (Tr. 332-33). The doctor further reported that Plaintiff is "a severely depressed and highly conflicted individual who feels hopeless, lethargic, and powerless to positively impact her future." (Tr. 333).

Dr. Greenbaum diagnosed Plaintiff as suffering from major depression and multiple physical impairments. Plaintiff's GAF score was rated as 42 and her prognosis was characterized as "poor." *Id.* The doctor concluded that "[g]iven the severity and refractory nature of [Plaintiff's]

psychiatric impairment in conjunction with her multiple medical issues she is not viewed as capable of engaging in employment at this time or in the foreseeable future." (Tr. 334).

The results of this examination, supported by objective testing and a detailed description of Plaintiff's mental status, reveal that Plaintiff is impaired to an extent well beyond that recognized by the ALJ. Considering Dr. Greenbaum's lengthy history treating Plaintiff, the results of this examination, which are consistent with much of the other record evidence, should not be disregarded. This evidence is material and given that this examination did not occur until after the ALJ issued his decision there exists good cause for Plaintiff's failure to present this evidence to the ALJ. The Court finds that there exists a reasonable probability that consideration of this material by the ALJ would have led to a different result. Accordingly, the Court recommends that this matter be remanded to the Commissioner, pursuant to sentence six of 42 U.S.C. § 405(g), for its further consideration.

## **CONCLUSION**

For the reasons articulated herein, the undersigned recommends that **this matter be remanded for further factual findings pursuant to sentence six of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: August 10, 2005                                                  /s/ Ellen S. Carmody
                                                                                         ELLEN S. CARMODY
                                                                                         United States Magistrate Judge